## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

**MARLA R. BAILEY,** )
   Plaintiff )
  )    Civil Action No. 2:19cv00011
v. )
  )    **REPORT AND**
**ANDREW SAUL,**[1] )    **RECOMMENDATION**
**Commissioner of Social Security,** )
   Defendant )    By: Pamela Meade Sargent
  )    United States Magistrate Judge

### I. Background and Standard of Review

Plaintiff, Marla R. Bailey, ("Bailey"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bailey protectively filed her application for DIB on May 28, 2015, alleging disability as of May 22, 2015, based on degenerative disc disease, ("DDD"), in the back and neck; headaches; hip pain; stomach problems; abnormal blood sugar levels; mitral valve issues; knee problems; a tear in her left shoulder; carpal tunnel syndrome in the left hand; depression; and anxiety. (Record, ("R."), at 13, 238-39, 252, 276, 295.) The claim was denied initially and upon reconsideration. (R. at 149-51, 155-57, 160-63, 165-67.) Bailey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 168.) The ALJ held a hearing on October 26, 2017, at which Bailey was represented by counsel. (R. at 30-75.)

By decision dated February 26, 2018, the ALJ denied Bailey's claim. (R. at 13-23.) The ALJ found that Bailey met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 15.) The ALJ found that Bailey had not engaged in substantial gainful activity since May 22, 2015, the alleged onset date.[2] (R. at 15.) The ALJ determined that Bailey had severe impairments, namely dysfunction of major joints – hip, shoulder and knee; DDD of the lumbar and cervical spine; bipolar disorder; panic disorder; depression; and

---

[2]  Therefore, Bailey must show that she was disabled between May 22, 2015, the alleged onset date, and February 26, 2018, the date of the decision, in order to be eligible for benefits.

anxiety, but he found that Bailey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. (R. at 16-18.) The ALJ found that Bailey had the residual functional capacity to perform simple, routine light[3] work that required no more than occasional balancing; stooping; kneeling, crouching; crawling; or climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; no concentrated exposure to vibration, pulmonary irritants and hazards, such as unprotected heights or moving mechanical parts; no more than simple work decisions; no more than occasional changes in a routine work setting; and no more than occasional, superficial interaction with co-workers and the public. (R. at 18.) The ALJ found that Bailey was unable to perform her past relevant work. (R. at 22.) Based on Bailey's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Bailey could perform, including the jobs of a mail clerk, an office helper and a production inspector. (R. at 22-23.) Thus, the ALJ concluded that Bailey was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Bailey pursued her administrative appeals, (R. at 233-35), but the Appeals Council denied his request for review. (R. at 1-6.) Bailey then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Bailey's motion for summary judgment filed August

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

15, 2019, and the Commissioner's motion for summary judgment filed October 11, 2019.

## II. Facts[4]

Bailey was born in 1970, (R. at 238), which, at the time of her alleged onset date and the date of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). Bailey has a high school education with special education instruction. (R. at 253.) She has past work experience as a school cook, a school cafeteria manager and an assistant restaurant manager. (R. at 22, 45-46, 50, 66.) Bailey testified that she stopped working as a school cafeteria manager in May 2015, and, at the time of the hearing, was receiving disability retirement from the Virginia Retirement System, ("VRS"), backdated to 2015. (R. at 40.) She stated she had been treating with Dr. Bryan Watson, D.O., her primary care physician, for about 15 years. (R. at 40-41.) Bailey further testified she currently was treating with Dr. Timothy McGarry, M.D., an orthopedic surgeon, for issues with her left knee, and she previously had seen a different orthopedist for this issue before she stopped working. (R. at 42-43.) She stated she had previously undergone rooster comb injections in her left knee to regenerate cartilage, which were unsuccessful. (R. at 43.) Bailey testified she also was having some back and neck problems while she was working, for which she took pain medication, including roxicodone and gabapentin. (R. at 43-44.) However, she stated it was "hard to take a pain pill four times a day and … work." (R. at 44.) Specifically, Bailey stated this medication made her dizzy and, sometimes, sleepy, noting she sometimes had to lay her head

---

[4] Contrary to the Commissioner's assertion in his brief, Bailey does not limit her arguments on appeal to this court to the ALJ's decision with regard to her mental impairments only. Therefore, while the Commissioner restricted his arguments to Bailey's mental impairments and associated limitations, this court also will discuss Bailey's physical impairments and associated limitations.

down on a desk somewhere or she would doze off at times. (R. at 44.) However, Bailey testified this behavior also was a factor of her anxiety disorder. (R. at 44-45.) She stated she currently was taking oxycodone and gabapentin for pain. (R. at 62-63.)

Bailey testified that, in 2015 and 2016, she could stand and walk for about 15 minutes before needing to rest for up to five minutes. (R. at 51-52.) During that same time period, she had difficulty sitting in hard chairs, which was helped with injections. (R. at 52.) Nonetheless, Bailey stated she could sit for about 15 minutes without interruption. (R. at 53.) She stated she spent most of her day sitting in a recliner or lying in bed. (R. at 53.) Bailey testified she could get up to walk to the kitchen, but then would have to sit down. (R. at 53.) She stated she would sit on a stool when she cooked. (R. at 53.) She stated she could make simple meals like sandwiches, burgers and microwaveable foods. (R. at 54.) However, Bailey testified her children did most things for her, and she testified she could not carry items weighing 10 pounds. (R. at 54.) She stated she could not bend, kneel, stoop or squat, stating if she bent over, it felt like her hips would "bust wide open." (R. at 55.) Bailey testified she had received injections in her hips and back before injuring her knee. (R. at 55.) She stated she was going down steps, and her knee "snapped." (R. at 56.) However, even prior to this knee injury, she stated she was having difficulty walking due to numbness in the front of her legs. (R. at 56.) Bailey testified her left hip and her back also were bothering her in 2015. (R. at 57.) She testified that surgery resolved her neck issues, and she no longer had difficulty with this. (R. at 57.) Bailey testified her left shoulder had a rotator cuff tear, resulting in numbness in her thumb and first three fingers and which caused her to drop things. (R. at 58.) Bailey testified she had undergone surgery on her right shoulder in the 1990s, but not the left one. (R. at 58-59.) She stated her right shoulder was "good," but her left shoulder would

go to "sleep" during the night, and she could not reach overhead with her left arm. (R. at 58-59.)

Bailey testified Dr. Watson attempted to treat her anxiety, but she had a problem trying to work while taking her medications. (R. at 45.) She testified she had been taking medication for depression and anxiety for 15 years. (R. at 59.) She stated she was taking seven mental health medications daily. (R. at 63.) However, Bailey testified none of these medications made her drowsy. (R. at 64-65.) She stated she was having two to three panic attacks daily at work, which she described as including shortness of breath, racing heart and crying episodes, and lasting about five minutes. (R. at 59-60.) Afterwards, she would feel "flustered" and "fluttery," and she would be drained of energy. (R. at 60.) Bailey testified these panic attacks decreased after she stopped working and began treating with Dr. Uzma Ehtesham, M.D., a psychiatrist. (R. at 60.) She stated she had treated at least monthly with Dr. Ehtesham since the Fall of 2015.[5] (R at 41.) Bailey testified that, at the time of the hearing, she had panic attacks if she went in stores or had to sit in an office waiting area with other people talking loudly. (R. at 60.) She stated loud noises made her nervous. (R. at 61.) Bailey testified being around people and loud noises were the reasons she stayed home. (R. at 61.) She stated she sometimes would go out for necessities, but she sometimes sent her daughter. (R. at 61.) Bailey testified she did not have panic attacks at home. (R. at 61.) She stated she was having about three panic attacks weekly at the time of the hearing, and for which Dr. Ehtesham had prescribed medication. (R. at 61-62.) Bailey testified her bipolar disorder caused her to cry a lot, and she stated she felt "good for nothing" and like there was "no use for

---

[5] However, Bailey testified there was a period of two to three months she could not see Dr. Ehtesham because the federal government seized her medical records. (R. at 41-42.)

[her] anymore." (R. at 62.)

Barry Hensley, a vocational expert, also was present and testified at Bailey's hearing. (R. at 65-71, 74.) He classified Bailey's past work as a school cook and a school kitchen manager as medium[6] and skilled, and her job as an assistant restaurant manager as light and skilled, but medium as performed by Bailey. (R. at 66.) Hensley testified if an individual was off task 15 percent of an eight-hour workday in addition to normal breaks and normally expected time off task, competitive employment would be precluded. (R. at 66-67.) Likewise, he testified two or more absences monthly on an ongoing basis would preclude competitive employment. (R. at 67.) Hensley testified that a hypothetical individual, who, on a consistent and ongoing basis, could not follow rules, interact with supervisors, function independently, maintain attention to their work to understand, remember and carry out complex job instructions, behave in an emotionally stable manner and be reliable on the job could not perform any work. (R. at 67.) Hensley testified that a hypothetical individual of Bailey's age, education and work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand/walk for four hours in an eight-hour workday; occasionally climb ramps or stairs; never climb ladders or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; have occasional exposure to hazards, such as unprotected heights or moving mechanical parts; have occasional exposure to dust, fumes, odors or pulmonary irritants and vibration; perform simple, routine tasks and make simple work-related decisions; respond appropriately to occasional changes in a routine

---

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting and carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2019).

work setting; and who could have only superficial contact[7] with the public and with co-workers, could not perform Bailey's past work and would have no transferrable skills from prior work within these limitations. (R. at 67-68.) However, Hensley testified such an individual could perform the jobs of a nonpostal mail clerk, an office helper and a production inspector, all at the light level of exertion. (R. at 68.) Hensley next was asked to consider the same hypothetical individual, but who could perform sedentary[8] work. (R. at 68-69.) Hensley testified such an individual could not perform any of Bailey's past work, but could perform the jobs of an inspector/sorter/tester; a material packer and sealer; and an extruder machine operator. (R. at 69.) Hensley next testified that the individual described in the first hypothetical, but who could never stoop, climb, kneel, balance, crouch or crawl, could not perform any work. (R. at 70.) He testified that an individual who could not use the left upper extremity for fine manipulation, handling and feeling due to numbness in the thumb and first three fingers; who would be limited to less than occasional use of the left upper extremity for reaching overhead; who would be limited to lifting items weighing five pounds with the left hand; and who could lift less than 10 pounds with both hands in combination, could not perform any work. (R. at 70-71.) The ALJ asked Hensley to consider the second hypothetical individual, but who would be limited to occasional handling, fingering and feeling with the left nondominant extremity. (R. at 74.) Hensley testified the jobs he listed at the sedentary level required use of both hands, and there would be no jobs such an

---

[7] Superficial contact was defined as meaning things like giving directions regarding the workplace or the time of day. (R. at 68.)

[8] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2019).

individual could perform. (R. at 74.)

In rendering his decision, the ALJ reviewed medical records from Medical Associates of Southwest Virginia; Holston Valley Medical Center, ("Holston Valley"); Norton Community Hospital, ("Norton Community"); Associated Orthopaedics; Wellmont Medical Associates; Lonesome Pine Hospital, ("Lonesome Pine"); Frontier Health; Dr. Bryan Watson, D.O.; Robert Spangler, Ph.D., a licensed clinical psychologist; Dr. Uzma Ehtesham, M.D., a psychiatrist; Blue Ridge Neuroscience Center, P.C., ("Blue Ridge"); Dr. Joseph Frye, D.O.; Dr. Timothy McGarry, M.D.; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; and Dr. Michael Cole, D.O., a state agency physician. Bailey's counsel submitted additional medical records from Dr. McGarry, Blue Ridge and Lonesome Pine to the Appeals Council.[9]

Diagnostic testing contained in the record, but dated prior to Bailey's alleged onset date, yielded the following findings: January 2011 x-rays showed early degenerative arthritis in both hips, (R. at 491); January 2011 x-rays of the lumbar spine showed DDD at the distal thoracic and lumbar spine, as well as facet joint arthritis, (R. at 492); a December 2011 MRI of the left lower extremity showed post-surgical changes within the distal tibial metadiaphysis from a 1989 leg fracture, (R. at 508-09); April 2013 x-rays of the lumbar spine showed worsening degenerative hypertrophic changes, (R. at 522); February 2014 x-rays of the right knee showed mild soft tissue swelling over the medial aspect and osteoarthritic changes of the

---

[9] Since the Appeals Council considered this evidence in deciding not to grant review, (R. at 1-6), this court also must consider it in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

medial compartment, (R. at 547); a March 2014 MRI of the right knee showed a large joint effusion, degenerative arthritis at the medial compartment of the right tibiofemoral joint, a bone bruise involving the tibial plateau and degenerative changes in the menisci, (R. at 627); a December 2014 lumbar MRI showed moderate DDD and significant facet arthropathy with hypertrophy of the ligaments, causing significant compromise of both neural foramina and mild compromise of the thecal sac at the L4-L5 level, severe DDD with minimal retrolisthesis at the L5-S1 level, as well as disc changes causing significant bilateral foraminal narrowing, and bulging annulus and facet arthropathy at the L3-L4 level, causing mild to moderate bilateral foraminal narrowing, (R. at 628-29); December 2014 left hip x-rays showed mild osteoarthritic change of the hip joint and sacroiliac, ("SI"), joint, (R. at 629); and December 2014 lumbar spine x-rays showed multi-level degenerative disc changes, most prominent at the L4-L5 and L5-S1 levels, as well as facet arthropathy at the L4-L5 and L5-S1 levels, (R. at 630.) Additionally, April 2013 left hip x-rays were normal, as were x-rays of the right leg and the left shoulder, taken in July and September 2013, respectively. (R. at 523, 532-33.)

Bailey saw Dr. Bryan Watson, D.O., her primary care physician, on May 22, 2015, with complaints of moderate knee pain and moderate depression and anxiety. (R. at 617.) She reported that she had been arrested at her job recently for being intoxicated on school property, noting she had taken Klonopin, BuSpar and Phenergan. (R. at 618.) Due to this incident, she resigned her position, stating she could not work and deal with her knee and back pain. (R. at 618.) Bailey stated she stopped taking Klonopin and BuSpar. (R. at 621.) She advised she could not get a needed knee surgery because she was going to lose her insurance. (R. at 621.) On examination, Bailey was alert, oriented and cooperative, and she had a normal mood, affect, speech, behavior, judgment, cognition and memory. (R. at 620-21.) Dr.

Watson noted Bailey did not have a depressed mood. (R. at 621.) She had right knee swelling and tenderness; decreased range of motion, tenderness and spasm in the lumbar back; and bilateral leg weakness of 4/5. (R. at 620.) Dr. Watson decreased Bailey's dosage of Klonopin, he discontinued BuSpar, he continued her pain medications, and he referred her to behavioral health. (R. at 621.)

Bailey had a telephone pre-screening with Lara Lilly, M.Ed. at Frontier Health, on May 22, 2015. (R. at 641.) Bailey reported she had not taken her mental health medications since losing her job and being arrested. (R. at 641.) She was tearful, but denied suicidal or homicidal ideation, as well as hallucinations. (R. at 641.) On May 26, 2015, Bailey saw Betty Lemarr, B.A., a case manager, at which time she reported her arrest at her job on May 14, 2015, by a school resource officer for being under the influence on school property. (R. at 633-35.) Bailey advised Lemarr she was prescribed these medications, which included Klonopin, BuSpar, Procrit and Neurontin. (R. at 634.) She stated she resigned from her job, and she had an upcoming court date. (R. at 634.) She reported that her husband was not supportive, and she had experienced conflict with co-workers. (R. at 634.) Bailey reported being depressed, withdrawn, anxious and agitated, with a poor self-care, appetite disturbance and a history of head injuries. (R. at 634-35.) An absence of psychiatric problems was noted. (R. at 634.) She was provisionally diagnosed with anxiety state, unspecified; and depressive disorder, not elsewhere classified, and her Global Assessment of Functioning, ("GAF"),[10] score was placed at 60.[11] (R. at 634.)

---

[10] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health – illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[11] A GAF score of 51 to 60 indicates the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Bailey did not return for her scheduled appointment on June 5, 2015, and she was sent a letter instructing her to call if she wished to continue services. (R. at 637-38.)

On May 28, 2015, Dr. Watson completed a Physician's Report for the VRS in conjunction with Bailey's disability retirement application. (R. at 481-84.) Dr. Watson stated Bailey was diagnosed with significant lumbar DDD in November 2014; severe osteoarthritis of the right knee in March 2014; and anxiety and depression in April 2015. (R. at 481.) He stated her physical impairments prohibited her from prolonged sitting or standing due to pain. (R. at 481.) He stated Bailey's condition required opiate pain medication for daily activities. (R. at 481.) Dr. Watson stated Bailey became unable to work on May 22, 2015. (R. at 481.) Dr. Watson stated Bailey had chronic pain and swelling in the right knee; she had chronic pain, spasm and decreased range of motion in the lumbar spine; chronic weakness in both legs; and worsening depression and anxiety since her son had legal issues in late 2013. (R. at 481.) At that time, Bailey's medications included, among other things, Wellbutrin, Klonopin, Neurontin and oxycodone. (R. at 482.) He noted that Bailey had seen pain management for bilateral SI joint injections, but she had been putting off knee surgery due to work. (R. at 482.) He opined her DDD would not improve, and her knee pain would improve only with surgery. (R. at 482.) Dr. Watson noted Bailey's anxiety and depression were chronic and seemed to be worsening, for which she had been sent to behavioral health. (R. at 482.) Dr. Watson opined Bailey's condition had worsened over the prior year. (R. at 482.) He opined she was permanently disabled from performing her usual work duties. (R. at 482.)

On June 16, 2015, Bailey complained of intermittent right knee pain and moderate depression and anxiety with anhedonia and headaches. (R. at 689.) She was alert, oriented and cooperative, and she had a normal mood, affect, speech,

behavior, judgment, cognition and memory. (R. at 691-92.) Bailey's mood was not depressed. (R. at 692.) She had swelling and tenderness of the right knee; decreased range of motion, tenderness and spasm of the lumbar back; and slight leg weakness in both legs at 4/5. (R. at 691-92.) Dr. Watson's diagnoses remained the same, except he added headache and neck pain. (R. at 692-93.) He noted that her lumbar DDD was stable, and he continued her on medications. (R. at 693.) He also ordered a CT scan of her head and cervical spine x-rays. (R. at 693.) These x-rays, taken that day, showed significant degenerative disc changes at the C4-C5 and C5-C6 levels with reversal of cervical curvature due to muscle spasm. (R. at 781.) A CT scan of Bailey's head, also performed that day, was normal. (R. at 781.) Bailey saw Dr. Watson on four other occasions in 2015. Over this time, she complained of depression, anxiety, insomnia, anhedonia, intermittent headaches, back pain, nausea and neck pain, which radiated into the right arm and shoulder. (R. at 819, 824-25, 831, 1189.) With regard to Bailey's mental health complaints, in July 2015, she rated her depression and anxiety as moderate, noting she had lost her health insurance and could no longer afford either behavioral health treatment or BuSpar. (R. at 819, 823.) Dr. Watson asked Bailey to call Stone Mountain Health Services to attempt to get a therapist. (R. at 824.) In September 2015, Bailey's mood was anxious and depressed, and she was tearful. (R. at 828.) In October 2015, Bailey described her depression and anxiety as severe. (R at 831.) She reported she was seeing a psychiatrist, who had prescribed Depakote and Celexa. (R. at 831.) In November 2015, Bailey continued to report severe depression and anxiety. (R. at 1189.) Dr. Watson noted she had a depressed mood. (R. at 1193.) Over this time, Bailey consistently was alert, oriented and cooperative with normal speech, behavior, judgment, cognition and memory. (R. at 822, 827-28, 834, 1192-93.) Dr. Watson diagnosed Bailey with anxiety and depressive disorder, and he continued her on medications, including Wellbutrin, Klonopin and BuSpar. (R. at 822-23, 828-29, 835, 1193-94.)

With regard to Bailey's physical complaints, in July 2015, Dr. Watson ordered an MRI of her brain, as he felt the headaches might be the result of severe cervical DDD. (R. at 823.) She had swelling and tenderness of the right knee; decreased range of motion, tenderness and spasm of the lumbar back; normal strength and reflexes, but weakness of 4/5 in both legs; and no focal neurological deficits. (R. at 822.) Dr. Watson diagnosed, among other things, degeneration of intervertebral disc; joint pain in the pelvic and thigh regions; low back pain; left shoulder pain; right knee pain; left hip pain; SI pain; lumbar facet arthropathy; lumbar DDD and piriformis syndrome on the left. (R. at 822-23.) In September 2015, Bailey reported worsened headaches, as well as worsened left hip pain, since falling earlier that month after an episode of syncope. (R. at 824-25.) She had tenderness with no swelling of the left hip; and decreased range of motion and tenderness of the cervical spine. (R. at 828.) Otherwise, her examination was the same. Dr. Watson added a diagnosis of syncope, and he ordered various diagnostic tests to evaluate Bailey's headaches and syncope, including an EKG, orthostatics, a brain MRI, a 2D echo and a Holter monitor. (R. at 829.) These tests all yielded normal results. (R. at 804-13, 817, 829, 842, 845.) Dr. Watson also ordered an MRI of the cervical spine and left hip x-rays. (R. at 829-30.) This MRI, dated October 13, 2015, showed severe DDD at the C5-C6 level with disc osteophyte complex, causing significant spinal stenosis and significant compromise of both lateral recesses. (R. at 815.) There also were tiny central disc protrusions at the C3-C4 and C4-C5 levels, minimally impinging on the thecal sac at both levels. (R. at 815.) In October 2015, Bailey complained of neck pain, radiating into the right arm and shoulder with associated headaches. (R. at 831.) Her examination remained unchanged, as did Dr. Watson's diagnoses. (R. at 834-35.) He referred Bailey to a neurosurgeon and to pain management. (R. at 835.) In November 2015, Bailey complained of constant neck pain, radiating into the right arm and shoulder. (R. at 1189.) Her examination was the same, as were Dr. Watson's diagnoses. (R. at 1192-

93.) He ordered a whole body bone scan and referred Bailey to pain management. (R. at 1193-94.) Over this time, Dr. Watson prescribed pain medications, including oxycodone and gabapentin, and he prescribed a TENS unit. (R. at 823, 829, 835, 1193-94.)

Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on Bailey on August 14, 2015. (R. at 121-22.) Milan opined Bailey was not restricted in her activities of daily living, in her ability to maintain social functioning or to maintain concentration, persistence or pace, and he opined she had not experienced any repeated episodes of extended-duration decompensation. (R. at 122.) Milan noted Bailey had a history of depression and anxiety with past and current diagnoses by an osteopathic doctor, but her examinations appeared normal, and her activities of daily living predominantly were limited by physical limitations. (R. at 122.) Milan concluded Bailey did not suffer from a severe mental impairment. (R. at 121.)

On August 19, 2015, Dr. Richard Surrusco, M.D., completed a physical residual functional capacity assessment of Bailey. (R. at 123-25.) Dr. Surrusco opined she could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; she could stand/walk for a total of two hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 123-24.) Dr. Surrusco imposed no manipulative, visual or communicative limitations, but he opined Bailey should avoid concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 124-25.)

Bailey began treatment for anxiety and depression with Dr. Uzma Ehtesham, M.D., a psychiatrist, on August 25, 2015. (R. at 867.) At that time, she endorsed symptoms of agitation, excessive worry, restlessness, heart palpitations, sweating, sadness, fatigue and insomnia, but she denied delusions, hallucinations and symptoms of post-traumatic stress disorder, ("PTSD"), or attention deficits. (R. at 867-68.) She rated her anxiety as a six and her depression as a three on a 10-point scale. (R. at 867.) Bailey had a normal gait, fair hygiene and grooming, intermittent eye contact, spontaneous speech, normal motor activity, a congruent affect to mood, fair insight and judgment; goal-oriented thought process; and impaired reality testing. (R. at 868.) Dr. Ehtesham diagnosed Bailey with panic disorder without agoraphobia, and she continued her on Wellbutrin and Klonopin. (R. at 868.) Bailey saw Dr. Ehtesham on five other occasions in 2015. Over this time, Bailey reported symptoms of paranoia, pressured speech, low self-esteem, insomnia, agitation, panic, depression, mania and delusions. (R. at 860, 863, 1125, 1127.) On September 10, 2015, Bailey had a tearful affect, but by September 28, 2015, she had a euthymic affect with congruent mood. (R. at 864, 866.) In October 2015, Bailey reported she remained depressed and had "bad anxiety." (R. at 860.) Her examination was unchanged. (R. at 861.) In December 2015, Bailey reported she had trouble sleeping and was having "a little bit" of anxiety and depression. (R. at 1125.) Her examination was the same, except Dr. Ehtesham noted her insight, judgment and reality testing were improved. (R. at 1125.) Over this time, Dr. Ehtesham continued to diagnose Bailey with panic disorder without agoraphobia, and on November 17, 2015, she diagnosed bipolar disorder, most recent episode unspecified. (R. at 861, 864, 866, 1126, 1128.) Dr. Ehtesham prescribed various medications, including Wellbutrin, Klonopin, Depakote, Lexapro and Vistaril. (R. at 861, 866, 1126.)

Dr. Ehtesham completed a mental assessment of Bailey on October 30, 2015,

finding she had a slight limitation in her ability to understand, remember and carry out simple job instructions. (R. at 1130-32.) Dr. Ehtesham opined Bailey could satisfactorily relate to co-workers; deal with the public; use judgment in public; deal with work stresses; understand, remember and carry out detailed job instructions; maintain personal appearance; and relate predictably in social situations. (R. at 1130-31.) She opined Bailey had an unsatisfactory ability to follow work rules; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; and to demonstrate reliability. (R. at 1130-31.) Dr. Ehtesham opined Bailey could manage benefits in her own best interest and that she would be absent from work more than two days monthly. (R. at 1132.) As support for her findings, Dr. Ehtesham noted Bailey had racing thoughts, severe mood swings and severe panic attacks. (R. at 1131-32.)

On September 9, 2015, Bailey presented to the emergency department at Lonesome Pine with complaints of headache and left hip pain after falling and hitting her left hip and the back of her head on a tile floor. (R at 785.) Bailey was alert and oriented and in no distress; she had a small hematoma/swelling of the scalp over the left occipital area; she had normal range of motion of the neck, both shoulders, the left hip and the cervical back; there was no tenderness, swelling, effusion, crepitus, deformity, laceration, pain or spasm of the left shoulder; Bailey had normal strength of the left shoulder; she had no tenderness of the left hip; no tenderness, swelling, edema, deformity, laceration, pain or spasm of the cervical back; and the right shoulder, thoracic back and lumbar back were normal. (R. at 788.) Bailey had a normal mood, affect and behavior. (R. at 788.) A CT scan of Bailey's head was normal, and a CT scan of her cervical spine showed significant DDD at the C5-C6 level with narrowing of the neural foramina by osteophytes. (R. at 790-91.) A chest

-17-

x-ray showed no definite acute abnormality, and an x-ray of the pelvis also was normal. (R. at 791-92.) X-rays of the lumbar spine showed significant multilevel DDD. (R. at 792-93.)

Bailey saw Robert S. Spangler, Ed.D., a licensed psychologist, on September 22, 2015, at her attorney's referral. (R. at 773-79.) Spangler reported Bailey was socially confident, but anxious and depressed; she generally understood the instructions for each task; she demonstrated good concentration on her medications, but was in obvious discomfort; and she was appropriately persistent on tasks, but her pace was impacted, as she stood up in between tasks three times. (R. at 774.) Bailey reported her depression and anxiety, which began about 10 years previously, had worsened since the work incident prompting her resignation in May 2015. (R. at 774-75.) She reported she could not afford mental health treatment at Frontier Health without her health insurance, which she lost after her resignation, but she recently began seeing Dr. Ehtesham. (R. at 775.) Bailey reported a "dysfunctional family arrangement,"[12] which exacerbated her mental health symptoms. (R. at 776.)

On mental status examination, Bailey was alert, fully oriented, cooperative, compliant and forthcoming with adequate recall of recent and remote events; she had fair eye contact, tense motor activity and a tearful/depressed/anxious mood with labile affect; she repeated two words after five minutes and eight numbers serially forward and five backward; she completed Serial 7s and 3s slowly, but performed Serial 5s adequately; there were no loose or illogical associations, and she spelled the word "world" both forward and backward; her judgment and insight were consistent with average intelligence; stream of thought was unremarkable; thought

---

[12] Bailey advised Spangler she lived with, and supported, her husband, son, daughter-in-law and two grandchildren for four years before losing her job. (R. at 775.)

content was nonpsychotic; delusional thought was not evident; perceptual abnormalities were absent except for slow speed; she was emotionally labile; and she denied suicidal or homicidal ideation. (R. at 776-77.) Spangler opined Bailey was functioning in the average range of intelligence, and he deemed her credible. (R. at 777.) Bailey reported activities of daily living to include attending church on "good days," but she noted she was allowed to stand and walk around if needed. (R. at 777.) She reported getting up about 5:00 a.m. and sitting in her recliner with her legs elevated due to pain. (R. at 777.) Bailey stated she watched some television, but she reported her family members did the cooking, cleaning, laundry, grocery shopping, yard work, and animal care. (R. at 777.) She stated she was "up and down" all night due to chronic pain, muscle spasms, "body jerks" and frequent urination, and she was very tired when she got up in the mornings. (R. at 777.)

Spangler stated Bailey's social skills were adequate when she was not labile, and she related well with him. (R. at 777.) He opined she did not have the judgment, at that time, necessary to handle her own financial affairs, if awarded benefits. (R. at 777.) The Personality Assessment Inventory, ("PAI"), showed elevated depression, anxiety and stress scales. (R. at 778.) The Bender Visual Motor Gestalt Test revealed an inadequate pace. (R. at 778.) Spangler diagnosed major depressive disorder, single, severe; generalized anxiety disorder, severe; average intelligence; and slow pace. (R. at 779.) He opined Bailey needed to continue with psychiatric treatment, and he deemed her prognosis to be guarded. (R. at 778.)

On September 28, 2015, Spangler also completed a mental assessment of Bailey's work-related activities, finding she had a limited, but satisfactory, ability to maintain attention and concentration if on her medications; a seriously limited ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment

in public, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in social situations; and no useful ability to deal with work stress, to understand, remember and carry out both detailed and complex job instructions and to demonstrate reliability. (R. at 769-71.) He opined that Bailey's impairments met or equaled the medical listings for depressive, bipolar and related disorders and for anxiety and obsessive compulsive disorders, found at § 12.04 and § 12.06, respectively. (R. at 771.) Spangler opined Bailey was not capable of managing benefits in her own best interest and that she would be absent from work more than two days monthly. (R. at 771.) Spangler indicated that these findings were supported by Bailey's diagnoses of major depressive disorder, single episode, severe; and severe generalized anxiety disorder, as well as average intelligence and slow pace. (R. at 769-70.) Lastly, Spangler stated that all of Bailey's work-related activities were significantly impacted by her "severe depression and severe free floating, generalized anxiety." (R. at 771.)

On November 16, 2015, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF of Bailey. (R. at 137-38.) He opined she had no limitations in her ability to perform activities of daily living, to maintain social functioning or to maintain concentration persistence or pace, and she had experienced no repeated episodes of extended-duration decompensation. (R. at 137.) Leizer concluded Bailey had a severe anxiety disorder and a severe affective disorder, but she could perform simple, routine work. (R. at 137-38.) The same day, Leizer also completed a mental residual functional capacity assessment of Bailey, finding she was moderately limited in her abilities to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. at 141-42.) In all other areas assessed, Leizer opined Bailey either had no limitations or was not significantly limited. (R. at 141-42.)

Bailey saw Dr. David Pryputniewicz, M.D., a neurosurgeon with Blue Ridge, on November 18, 2015, with complaints of cervical pain and left upper extremity pain. (R. at 982.) Bailey reported chronic neck pain that had worsened over the years and significantly worsened over the previous year. (R. at 982.) She reported she also began to have left upper extremity pain and numbness into the fingers. (R. at 982.) Bailey stated the pain started in the cervical region and radiated through the right side of the neck and into the right arm to the elbow. (R. at 982.) She, again, reported anxiety and depression. (R. at 983.) On examination, her gait was nonantalgic; she had moderate cervical paraspinous muscle contractions, bilaterally; she had tenderness of the cervical spine; she had decreased range of motion of the neck; strength was full; she had normal muscle tone and no atrophy of any extremity; she had intact sensation throughout; deep tendon reflexes were 2+ and symmetric; and she was oriented with an appropriate mood and affect. (R at 983-84.) Dr. Pryputniewicz reviewed the October 2015 MRI of the cervical spine and diagnosed Bailey with cervical spondylosis with radiculopathy; mid-level cervical disc degeneration; cervical spinal stenosis, central stenosis and bilateral recess stenosis at the C5-C6 level due to disc osteophyte complex; cervical disc displacement of the mid-cervical region, small central disc protrusions at the C3-C4 and C4-C5 levels; left arm pain with an element of left C6 radiculopathy; and cervicalgia. (R. at 984.) He referred Bailey for physical therapy and advised smoking cessation. (R. at 984.) He prescribed Robaxin for muscle spasms, and he placed no restrictions on Bailey's activity. (R. at 984.)

Bailey continued to treat with Dr. Ehtesham in 2016. In January 2016, she reported she was "about the same," noting she was "nervous still." (R. at 1123.) She continued to endorse symptoms of anxiety, depression, panic and mania. (R. at 1123.) Her examination was the same, except Bailey avoided eye contact and had a euthymic, but anxious, affect with congruent mood. (R. at 1123.) Insight and judgment, once again, were fair, and reality testing was improved. (R. at 1123.) Dr. Ehtesham continued to diagnose panic disorder without agoraphobia. (R. at 1124.) On August 30, 2016, Bailey stated she was "fair," and she endorsed symptoms of anxiety, panic, depression and mania. (R. at 1121.) She had a normal gait; fair hygiene and grooming; intermittent eye contact; spontaneous speech; a euthymic affect with congruent mood; fair insight and judgment; impaired reality testing; and goal-oriented thought process. (R. at 1121-22.) On September 12, 2016, Bailey reported being sad. (R. at 1119.) Her examination was the same, except Dr. Ehtesham described her affect as hypomanic. (R. at 1119.) On October 11, 2016, Bailey stated she was "fair." (R. at 1117.) Her examination was unchanged, but she had a full affect. (R. at 1117-18.) Later that month, Bailey stated she was about the same. (R. at 1115.) Her examination, again, was unchanged, except she had an anxious affect with congruent mood. (R. at 1115.) By December 6, 2016, Bailey stated she was doing "a lot better." (R. at 1113.) Her examination was the same, except her affect was agitated with congruent mood, judgment was intact, and reality testing was improved. (R. at 1113.) Over this time, Dr. Ehtesham continued to diagnose panic disorder without agoraphobia and bipolar disorder, most recent episode, mixed, moderate. (R. at 1114-16, 1118, 1122.) Dr. Ehtesham continued to prescribe medications, including Vistaril, Lexapro, Depakote, Topomax and BuSpar. (R. at 1114, 1116, 1118, 1120, 1122, 1124.)

Bailey continued treating with Dr. Watson, her primary care provider,

throughout 2016. In January 2016, Bailey continued to complain of radiating neck pain, for which she was seeing a neurosurgeon. (R. at 1203.) She also complained of severe depression and anxiety. (R. at 1203.) On examination, Bailey was alert, oriented and cooperative with a depressed, but not anxious, mood; she had normal speech, behavior, judgment, cognition and memory; she had decreased range of motion and tenderness of the cervical back; decreased range of motion, tenderness and spasm of the lumbar back; weakness of 4/5 in both legs; normal strength and reflexes; and no focal neurological deficits. (R. at 1206.) Dr. Watson's diagnoses of Bailey included anxiety; depressive disorder; low back pain; left shoulder pain; right knee pain; left hip pain; SI pain; lumbar facet arthropathy; lumbar DDD; headache; and cervical pain. (R. at 1207.) Dr. Watson noted Bailey's anxiety was worsened, as she was going through a divorce. (R. at 1207.) He further noted Bailey was planning to have neck surgery. (R. at 1207.) In March 2016, Bailey reported gradually worsening cervical pain since undergoing recent neck surgery. (R. at 1210-11.) Her examination and diagnoses were unchanged, and Dr. Watson prescribed Oxycontin for uncontrolled neck pain. (R. at 1213-14.) By April 2016, Bailey reported gradually improving neck pain, and her examination was the same. (R. at 1216, 1219-20.) In May 2016, she complained of back pain, neck pain and worsened depression and anxiety, but noted she had been out of Vistaril. (R. at 1225-26.) Examination was unchanged, except Dr. Watson noted Bailey's mood was "some better." (R. at 1226-27.) He also noted her neck pain was stable. (R. at 1228.) In June 2016, Bailey complained of severe anxiety and depression, but her examination and diagnoses were unchanged. (R. at 1231, 1234-35.) Dr. Watson referred her to behavioral health. (R. at 1236.) In July 2016, Bailey complained of neck pain and reported she had undergone a left SI joint injection on June 27, 2016. (R. at 1238, 1240, 1178-80.) She also reported seeing a therapist. (R. at 1242.) In August 2016, Bailey complained of constant lumbar pain. (R. at 1245.) However, her examination

and diagnoses remained unchanged. (R. at 1248-49.) Bailey advised Dr. Watson she was going to try to get back in with Dr. Ehtesham. (R. at 1249.) In October 2016, Bailey complained of constant lumbar pain that radiated into the left leg with associated abdominal pain and hip pain. (R. at 1252.) She also reported depression and anxiety. (R. at 1255.) Her examination was the same, except Dr. Watson noted epigastric tenderness and added generalized abdominal pain to her diagnoses. (R. at 1255-56.) Dr. Watson ordered x-rays, given Bailey's worsened left hip pain, and referred her to Dr. Joseph W. Frye, D.O., for evaluation of lumbar DDD and cervical radiculopathy. (R. at 1256-57.) He also ordered an abdominal CT scan. (R. at 1257.) In November 2016, Bailey complained of moderate depression and anxiety, back pain, left hip pain and neck pain. (R. at 1260, 1263.) Bailey no longer had abdominal tenderness on examination, and her mood was anxious, but not depressed. (R. at 1264.) Otherwise, examination was the same. (R. at 1263-64.) Dr. Watson noted Bailey's lumbar DDD was stable. (R. at 1265.) Over this time, Dr. Watson continued to prescribe medications for Bailey's mental health and physical impairments, including trazodone, Wellbutrin, gabapentin, oxycodone, Vistaril, Percocet, Klonopin and Atarax. (R. at 1220-21, 1228, 1236, 1243, 1249-50, 1256-57, 1264-65.)

Bailey continued to see Dr. Pryputniewicz from February 2016 to October 2016 for complaints of neck pain, back pain and leg pain. On February 9, 2016, she reported worsened neck pain that radiated into the left arm with numbness affecting all fingers. (R. at 978.) She stated physical therapy had exacerbated her pain, and she wished to discuss surgical intervention. (R. at 978.) Bailey also reported continued anxiety and depression. (R. at 979.) On examination, she was oriented with an appropriate mood and affect; she had a nonantalgic gait; moderate cervical paraspinous muscle contractions, bilaterally; cervical tenderness; decreased neck

range of motion; normal muscle strength and tone throughout with no atrophy in any extremity; intact sensation in all extremities; and full and symmetric deep tendon reflexes. (R. at 979-80.) Dr. Pryputniewicz added low back pain and left leg pain to Bailey's diagnoses. (R. at 980.) Bailey underwent cervical and lumbar myelograms and CT scans on February 15, 2016. (R. at 990-95.) The lumbar myelogram showed DDD throughout the lumbar spine with no spinal stenosis or nerve root compromise. (R. at 990.) The lumbar CT scan revealed an L4-L5 disc bulge with moderate facet joint degeneration and minor central stenosis; left foraminal spurs at the L4-L5 and L5-S1 levels with questionable mild left L4 nerve root compromise; severe DDD at the L5-S1 level; and disc bulging elsewhere throughout the lumbar spine without significant stenosis. (R. at 994-95.) The cervical myelogram showed a posterior disc spur at the C5-C6 level with decreased filling of both C6 nerve roots and slightly decreased filling of the left C5 and left C7 nerve roots. (R. at 991.) The cervical CT scan showed a large posterior spur at the C5-C6 level with moderate cord compression; severe foraminal narrowing, bilaterally, due to joint spurring; central extrusion at the C4-C5 level with a broad-based disc herniation at the C3-C4 level and very mild cord compression; a severe left C4-C5 facet osteoarthritis with severe left foraminal narrowing; moderate to severe right C3-C4 foraminal stenosis due to joint spurring; and severe left C6-C7 foraminal narrowing due to joint spurring. (R. at 992-93.) Bailey returned to Dr. Pryputniewicz a few days later, reporting her radiating neck pain continued to worsen. (R. at 973.) She also reported severe lumbar pain that radiated into the left buttock and down the left leg, as well as left arm pain, anxiety and depression. (R. at 973-74.) Bailey's examination was unchanged, except Dr. Pryputniewicz noted giveaway weakness in both legs due to pain. (R. at 974-75.) His diagnoses of Bailey remained the same. (R. at 975.) Bailey wished to proceed with neck surgery, which was scheduled for later that month. (R. at 975-76.) Dr. Pryputniewicz prescribed Robaxin for muscle spasms. (R. at 976.) On

February 29, 2016, Bailey underwent an anterior cervical discectomy and fusion, ("ACDF"), of the C5-C6 level of the cervical spine without complication. (R. at 1005-08.) By March 16, 2016, she reported she was doing well, noting her arm pain was completely resolved, and her neck pain was much improved. (R. at 969.) She reported some mild swelling of the right foot and tenderness over the right calf for a few days, and she continued to endorse low back pain, anxiety and depression. (R. at 969-70.) On examination, she continued to be alert, cooperative and oriented with an appropriate mood and affect. (R. at 970-71.) She had a well-healing incision and mild cervical paraspinous muscle contractions, bilaterally. (R. at 970.) Otherwise, Bailey's examination was unremarkable. (R. at 970-71.) X-rays showed the anterior hardware at C5-C6 in good position. (R. at 971.) Bailey's diagnoses remained unchanged, and Dr. Pryputniewicz ordered physical therapy to begin in two weeks. (R. at 971.) A venous doppler ultrasound of both legs was negative for deep vein thrombosis. (R. at 1018.)

In April 2016, Bailey complained of some pain at the base of the skull, radiating into the left shoulder, as well as low back pain, anxiety and depression, but she reported the right leg swelling had subsided. (R. at 966-67.) She felt she was doing very well post-operatively and that the surgery was of great benefit. (R. at 966.) Her surgical site was well-healed, and x-rays showed good progression of the C5-C6 fusion with good hardware placement. (R. at 967, 1009-11.) Bailey's diagnoses were unchanged, she was prescribed Robaxin, and physical therapy was scheduled to begin on April 26, 2016. (R. at 967-68.) In June 2016, Bailey continued to report pain at the base of the skull, radiating into the left shoulder, as well as some incision site pain with range of motion. (R. at 962.) She denied left arm pain, numbness or tingling. (R. at 962.) Bailey stated she had completed physical therapy, which was beneficial, and she stated she felt very well overall and that surgery was

beneficial. (R. at 962.) However, Bailey reported her lumbar pain and left leg pain had progressively worsened, and she had begun having difficulty raising her right leg. (R. at 962.) Bailey was alert, oriented and cooperative with an appropriate mood and affect. (R. at 963-64.) Dr. Pryputniewicz added sacroiliitis, not elsewhere classified, to Bailey's diagnoses, and he noted her cervical disc degeneration was stable. (R. at 964.) He recommended an SI joint injection and instructed Bailey to continue her medication regimen. (R. at 964-65.) In October 2016, Bailey reported this June 27, 2016, SI injection helped her back and hip pain by about 50 percent and gave her about three days of good relief. (R. at 960, 1016-17.) She reported continuing left buttock and left thigh pain, for which she took Percocet. (R. at 960.) She continued to have tenderness in the left SI joint and gluteal region, as well as limited rotation of the left lower extremity. (R. at 960-61.) Dr. Pryputniewicz's diagnoses remained unchanged, and he released Bailey from his care at that time. (R. at 961.)

Bailey continued receiving psychiatric treatment from Dr. Ehtesham throughout 2017. Over this time, she endorsed symptoms of anxiety, depression, panic, mania and delusions. (R. at 1101, 1103, 1105, 1107, 1109, 1111, 1397, 1400.) In January 2017, Bailey reported difficulty sleeping. (R. at 1111.) Her examination was the same, except she had an anxious affect with congruent mood, fair judgment and insight and intact reality testing. (R. at 1111.) In February 2017, she stated she had been out of her medications. (R. at 1109.) Her speech was soft, and she had improved judgment and reality testing. (R. at 1109.) Otherwise, examination was the same. (R. at 1109.) In March 2017, Bailey had fair judgment and insight and intact reality testing. (R. at 1107.) In April 2017, she reported feeling overwhelmed and stated she got frustrated when she celebrated Easter due to the noise. (R. at 1105.) In May 2017, Bailey reported she was "still shaking a lot." (R. at 1103.) Her

examination showed spontaneous speech, and her affect was anxious with a congruent mood. (R. at 1103.) In June 2015, Bailey stated, "I am not good today," noting family issues. (R. at 1101.) Her speech was frequent, and her affect was anxious. (R. at 1101.) In July 2017, Bailey had nonspontaneous speech, and her affect was anxious with congruent mood. (R. at 1099.) In August 2017, she reported shaking less, and her speech was nonspontaneous, but the remainder of her examination was unchanged. (R. at 1402-03.) In September 2017, Bailey's examination was unremarkable, except for nonspontaneous speech and an anxious affect with congruent mood. (R. at 1400-01.) In October 2017, Bailey stated her anxiety was "through the roof." (R. at 1397.) She stated she would cry, experience heavy breathing and shaking when at Walmart. (R. at 1397.) Examination was unremarkable, except Bailey had an anxious affect with congruent mood. (R. at 1397-98.) Over this time, Dr. Ehtesham continued to diagnose Bailey with panic disorder without agoraphobia and bipolar disorder. (R. at 1100, 1102, 1104, 1106, 1108, 1110, 1112, 1398, 1401, 1403.) Dr. Ehtesham continued Bailey on medications, including BuSpar, Depakote, Vistaril, Topamax, Seroquel and benztropine mesylate. (R. at 1100, 1102, 1104, 1106, 1108, 1110, 1114, 1398, 1401, 1403.)

Bailey also received treatment from Dr. Joseph W. Frye, D.O., in 2017. On January 31, 2017, Dr. Frye evaluated Bailey's gradually worsening low back pain, which radiated down the left leg to the foot and was associated with numbness and tingling. (R. at 1284.) Bailey reported her pain was worsened by bending, lying down, sitting, standing and twisting and alleviated by rest and medication. (R. at 1284-85.) She stated a left hip injection a few weeks previously helped significantly. (R. at 1284.) She reported she could care for herself, perform household chores, sleep at night and walk for exercise, but she could not perform yard work, work/job,

shopping or hobbies. (R. at 1287.) Dr. Frye reviewed Bailey's lumbar CT scan and left hip x-rays, which showed DDD throughout the lumbar spine and significant osteoarthritis and moderate bilateral SI joint arthritis. (R. at 1287-88.) On examination, Bailey was alert and fully oriented with a normal mood and affect and normal behavior, judgment and thought content. (R. at 1289-90.) She had a normal gait; full muscle strength in the lower extremities, except 4/5 in the left iliopsoas and left quadriceps; normal muscle bulk and tone; and normal sensation. (R. at 1290-91.) Dr. Frye diagnosed SI joint pain; chronic left-sided low back pain with left-sided sciatica; and degeneration of the lumbar intervertebral disc. (R. at 1291.) He performed left SI joint injections on February 28 and March 6, 2017. (R. at 1313-14, 1327.) Bailey saw Dr. Frye on three additional occasions in 2017. In April 2017, she reported continued low back pain that radiated into the left hip and left leg, but she reported 50 percent improvement of her hip pain with the injections. (R. at 1293.) Examination was unchanged, except for tenderness in the lumbar back; positive straight leg raise testing on the left; and decreased strength of 4/5 in the left quadriceps and in the left iliopsoas. (R. at 1295-97.) Dr. Frye added lumbar DDD and lumbar radiculitis to Bailey's diagnoses, and he noted her SI joint pain was improved with injections. (R. at 1297-98.) He performed a lumbar epidural steroid injection, ("ESI"), on July 11, 2017. (R. at 1314-15, 1343-44.) On August 2, 2017, Bailey reported 60 percent improvement in her back and leg pain following the ESI, and she described her pain as mild. (R. at 1299.) However, Bailey also reported injuring her left knee while going down some stairs about a week previously. (R. at 1299.) She stated she twisted it, heard it pop, and it swelled. (R. at 1299.) Bailey's examination was unremarkable, except for tenderness in the lumbar back; decreased strength to 4/5 in the left hip; and tenderness and effusion of the left knee. (R. at 1302-03.) Dr. Frye diagnosed lumbar radiculitis with 60 percent pain improvement following injection and acute left knee pain. (R. at 1304.) Later that month, Bailey

reported 50 percent improvement with the lumbar ESI. (R. at 1305.) Dr. Frye noted that a CT scan of Bailey's head, dated August 7, 2017, was normal, and left knee x-rays from August 8, 2017, showed significant degenerative disease with fluid, but a leg ultrasound was negative. (R. at 1307-08, 1351-56.) Bailey's examination was notable only for a left knee effusion with tenderness and decreased strength of 4/5 in the left hip. (R. at 1309-10.) Dr. Frye noted x-rays of the left knee showed grade 3 degenerative changes and a small effusion. (R. at 1310.) He diagnosed acute left knee pain and a mild knee effusion, and he drained fluid from her knee and administered a steroid injection. (R. at 1310-11.)

Bailey continued to treat with Dr. Watson in 2017. Over this time, she continued to complain of back pain, radiating into the left leg; left hip pain; swelling of the left leg with pain and tightness in the calf; left knee pain; headaches; neck pain; depression; and anxiety. (R. at 1267, 1270, 1275, 1278, 1359, 1362, 1368, 1370, 1375, 1378.) In March 2017, Bailey's examination was unremarkable, except for decreased range of motion and tenderness of the cervical back; decreased range of motion, tenderness and spasm of the lumbar back; and weakness of 4/5 in both legs. (R. at 1270-71.) She continued to be alert and oriented with a normal mood, affect, speech, behavior, judgment, cognition and memory. (R. at 1271.) Dr. Watson's diagnoses of Bailey included anxiety; left hip pain; lumbar DDD; SI joint pain; chronic left-sided low back pain with left-sided sciatica; and degeneration of lumbar intervertebral disc. (R. at 1271.) In May 2017, Bailey reported improvement in activity and medications. (R. at 1275.) Her examination was the same, except she had positive straight leg raise testing, bilaterally, and Dr. Watson added lumbar radiculitis to her diagnoses. (R. at 1279-80.) He administered a Toradol injection and ordered a lumbar MRI, which showed multilevel DDD and facet arthropathy, most prominent at the L4-L5 and L5-S1 levels. (R. at 1280-81, 1342.) On August 7, 2017,

Bailey complained of moderate left knee pain after falling at home with associated headaches. (R. at 1359.) She had an antalgic gait and giving way at times. (R. at 1359.) Bailey's examination was unchanged, except she had decreased range of motion, tenderness, swelling and effusion of the left knee. (R. at 1363.) Mental status examination remained unremarkable. (R. at 1363.) Dr. Watson noted Bailey's anxiety was stable, and he added cervical radiculopathy; acute left knee pain; right knee pain; bipolar disorder, currently depressed, moderate; and headache to her diagnoses. (R. at 1364-65.) The following day, Bailey complained of increased swelling of the left lower extremity with pain and tightness in the calf. (R. at 1368.) Dr. Watson ordered a brace and a cane for Bailey to use, and he prescribed Lasix. (R. at 1371.) A September 5, 2017, MRI of Bailey's left knee revealed degenerative arthritis with grade 3 to grade 4 degenerative changes of the medial articular cartilage; a complex tear and degenerative changes of the posterior aspect of the medial meniscus; medial extrusion of the mid-medial meniscus; and a large effusion of the knee joint. (R. at 1357-58.)

By September 13, 2017, Bailey complained of constant pedal edema with bilateral erythema, as well as continued headaches and neck pain. (R. at 1375.) She reported no relief with Lasix. (R. at 1375.) Bailey had 1+ pitting pedal edema, positive straight leg raise testing, bilaterally, and her mental status remained normal. (R. at 1379-80.) Dr. Watson added pedal edema; cellulitis of the left lower extremity; and a tear of the medial meniscus in the left knee. (R. at 1380.) He continued Lasix, ordered a 2D echo, prescribed an antibiotic for Bailey's cellulitis and referred Bailey to an orthopedic surgeon for her knee. (R. at 1381.) This echo was unremarkable except for mild mitral and tricuspid insufficiency. (R. at 98-99.) Over this time, Dr. Watson continued to prescribe various medications, including gabapentin, oxycodone, Mobic and Robaxin. (R. at 1272, 1280-81.)

Dr. Watson completed a physical assessment of Bailey on October 5, 2017, finding she could lift and carry items weighing up to 10 pounds occasionally and up to five pounds frequently; stand and/or walk for a total of up to three hours in an eight-hour workday, but for 15 minutes without interruption; never sit during an eight-hour workday; never climb, stoop, kneel, balance, crouch or crawl; and she had a limited ability to reach and to work around heights, moving machinery and vibration. (R. at 1385-87.) He opined she would be absent from work more than two days monthly. (R. at 1387.)[13]

Bailey saw Jonathan Shelton, P.A., a physician assistant at McGarry Orthopedic Clinic, on October 6, 2017, for an evaluation of left knee pain. (R. at 1389.) On examination, Bailey was alert and oriented with a well-adjusted, pleasant and cooperative mood and affect. (R. at 1389.) She had a normal gait; no edema in the lower extremities with normal pulses, deep tendon reflexes and sensation; and normal coordination. (R. at 1389.) Examination of Bailey's left knee revealed a normal range of motion, but with pain; mild effusion and medial joint line tenderness; positive McMurray test, medially; anterior and posterior drawer endpoints were firm; full muscle strength and normal muscle tone. (R. at 1389.) Shelton diagnosed internal derangement of the left knee. (R. at 1390.)

Bailey saw Dr. Timothy McGarry, M.D., an orthopedic surgeon, on October 19, 2017. (R. at 1405.) Her examination was unchanged, but Dr. McGarry further noted Bailey's judgment, insight, interpersonal dynamics and recent and remote memory were appropriate. (R. at 1405-06.) Her diagnosis was unchanged, and Dr. McGarry performed a left knee arthroscopy with partial medial and lateral

---

[13] Some of Dr. Watson's handwriting on this assessment is very difficult to decipher. The court has made its best effort in this regard.

meniscectomy with debridement of cartilage and excision of a tibial bone spur on October 27, 2017. (R. at 84-85, 1406-07.) When she returned on November 9, 2017, for a surgical follow up, Shelton noted that Bailey had done quite well and was pleased with the outcome, noting she had experienced a good recovery with no restrictions in range of motion or pain. (R. at 107.) Examination showed mild knee effusion and medial joint line tenderness, as well as ecchymosis. (R. at 107.) Bailey was weight bearing as tolerated, Shelton advised her to continue with home exercises, and he ordered a four-week course of physical therapy. (R. at 107.)

On December 5, 2017, Bailey presented to the emergency department at Lonesome Pine with complaints of headache, nausea and neck pain after being involved in a motor vehicle accident. (R. at 91.) Examination revealed Bailey was alert and oriented with a normal mood, affect and behavior. (R. at 93-94.) She had a normal range of motion of the neck and a normal musculoskeletal examination, except for mild tenderness in the posterior aspect of the neck. (R. at 94.) A cervical spine CT showed a C4-C5 central disc protrusion, and a CT scan of Bailey's head was normal. (R. at 95-97.) It was noted that Bailey's cervical disc disease and disc protrusion were chronic in nature, and she was advised to follow up with her primary care provider in a week. (R. at 95.)

Bailey returned to Dr. McGarry's office on December 7, 2017, reporting an exacerbation of symptoms due to a motor vehicle accident. (R. at 109-10.) She had mild effusion of the knee, medial condyle tenderness and medial joint line tenderness; firm medial and lateral stability at 30 degrees flexion; 4+ strength in the quadriceps and hamstring; a clean, dry and intact incision site; and a limping gait on the left. (R. at 109.) Left knee x-rays showed the medial compartment to be completely narrowed, as well as spurring of the superior patella and femur. (R. at

109.) Beth Ashe, P.A., a physician assistant, advised Bailey she had osteoarthritis of the joint and would be facing injections and possible total knee replacement at some point in the future. (R. at 110.) Bailey was advised to follow up in six weeks for a possible corticosteroid injection, and she was instructed to continue home exercises and physical therapy. (R. at 109-10.)

On March 7, 2018, Bailey saw Bethany Millsaps, N.P., a nurse practitioner for Dr. Pryputniewicz, reporting neck and right shoulder blade pain since being involved in a motor vehicle accident in December 2017. (R. at 111.) She further reported developing daily headaches in the right occipital and temporal region since her last visit. (R. at 111.) Bailey denied anxiety and depression. (R. at 113.) She had no tenderness to palpation of either upper extremity; she had full strength in both upper extremities; she had normal reflexes, except decreased to 1+ in the knees and ankles, bilaterally; she had intact sensation; she could normally perform heel-to-toe walking; she could stand without difficulty; she had a limping gait due to left knee pain; and she was fully oriented with normal attention and concentration and a normal mood and affect. (R. at 113.) Millsaps reviewed a December 2017 cervical CT scan before diagnosing Bailey with displacement of an intervertebral disc at the C4-C5 level; cervicalgia; and anesthesia of the skin. (R. at 114.) She ordered a short course of muscle relaxers and a cervical MRI. (R. at 114.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the

medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings. Under the regulations, the weight afforded to any medical opinion is dependent on a variety of factors, set forth in 20 C.F.R. § 404.1527(c), including (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the source's opinion; (4) the consistency of the opinion with the record; and (5) the specialization of the source. *See* 20 C.F.R. § 404.1527(c) (2019).

In her brief, Bailey argues that the ALJ's residual functional capacity finding is not supported by substantial evidence of record. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Specifically, she argues that the ALJ erred in his weighing of the medical evidence, failing to explain why he rejected the portions of the assessments from Dr. Ehtesham, Spangler and Dr. Watson which would render her disabled. (Plaintiff's Brief at 6-7.)

The ALJ found that Bailey had the residual functional capacity to perform simple, routine light work that required no more than occasional balancing, stooping, kneeling, crouching, crawling or climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; no concentrated exposure to vibration, pulmonary irritants and hazards, such as unprotected heights or moving mechanical parts; no more than simple work decisions; no more than occasional changes in a routine work

setting; and no more than occasional, superficial interaction with co-workers and the public. (R. at 18.)

In making this residual functional capacity finding, the ALJ stated that he was giving "some weight" to the opinions of Dr. Watson, Dr. Ehtesham and Spangler. (R. at 21.) I first will discuss the ALJ's weighing of the medical evidence with regard to Bailey's mental health and impairments. In a September 2015 check-box form, psychologist Spangler opined Bailey had no useful ability to deal with work stresses; to understand, remember and carry out both detailed and complex instructions; and to demonstrate reliability. However, he opined she had a satisfactory ability to maintain attention and concentration if medicated, and she had a fair ability to perform all other work-related mental abilities, including understanding, remembering and carrying out simple job instructions. Spangler further opined Bailey would miss more than two workdays monthly due to her impairments. The ALJ stated he was giving this opinion "some weight," noting that, although it was based on an in-person examination, the opinions were somewhat vague, and Spangler's absenteeism finding was not supported by the evidence. (R. at 21.) The ALJ properly considered that Spangler was an examining source in his weighing of this evidence. *See* 20 C.F.R. § 404.1527(c)(1) (2019) (generally, more weight is given to medical opinions from examining versus nonexamining sources). However, Spangler examined Bailey on only one occasion, at her attorney's referral, for the sole purpose of generating evidence for her disability claim, not for treatment purposes. *See* 20 C.F.R. § 404.1527(c)(2) (2019) (generally, more weight is given to medical opinions from treating sources, who are likely to be able to provide a "detailed, longitudinal picture" of a claimant's medical impairments); *see also Mefford v. Berryhill*, 2018 WL 7550260, at *8 (W.D. Va. Oct. 11, 2018) (citing *Holman v. Astrue*,

2012 WL 2678933, at *7 (M.D. Tenn. May 31, 2012) ("Because Dr. Blevins only examined Plaintiff one time, at the request of his attorney, specifically for the purposes of determining Plaintiff's ability to perform work-related activities, and because his findings were inconsistent with the [other substantial evidence of record], the ALJ properly accorded little weight to Dr. Blevins' opinion.")); *Hayes v. Astrue*, 2010 WL 1904965, at *8 (W.D. Va. May 12, 2010) (while "referral by counsel and a one-time examination are not grounds, in and of themselves, to reject an examiner's opinion, they are relevant factors to consider"). I also note that such check-box forms as the one used by Spangler, are not entitled to great weight. *See Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-the-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician). I cannot agree with the ALJ's description of Spangler's assessment as "vague," as he indicated various reasons for his findings on the assessment form, and it was accompanied by a contemporaneous, and rather lengthy, report prepared by Spangler. Nonetheless, for the following reasons, I find that substantial evidence exists in the record to support the ALJ's finding that Bailey does not suffer from a disabling mental impairment.

First, Spangler's own assessment indicates Bailey had a good ability to maintain attention and concentration when properly medicated and a fair ability

to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. In his accompanying report, Spangler found Bailey to be cooperative, she appeared socially confident, she generally understood the instructions for the tasks given, she demonstrated good concentration, and she was appropriately persistent on tasks. Spangler further noted Bailey was alert, oriented, had adequate recall, displayed fair eye contact, and she was cooperative, compliant and forthcoming.  Additionally, Bailey's primary care provider, Dr. Watson, consistently indicated that she had normal speech, behavior, judgment, cognition and memory, and she many times had a normal mood and affect. Lastly, state agency psychologists Milan and Leizer both opined that Bailey experienced no restrictions in her activities of daily living, had no difficulties maintaining social functioning or maintaining concentration, persistence or pace, and she had experienced no episodes of extended-duration decompensation. State agency psychologist Leizer concluded Bailey could perform simple, routine work. Thus, Spangler's findings that indicated Bailey suffered from disabling mental impairments are inconsistent with the record evidence, and substantial evidence supports the ALJ's decision to afford them discounted weight.

In October 2015, Dr. Ehtesham, Bailey's treating psychiatrist, opined in a check-box assessment that Bailey had an unsatisfactory ability to perform many work-related mental abilities, including to follow work rules; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an

emotionally stable manner; and to demonstrate reliability. She further opined Bailey would be absent from work more than two days monthly. Dr. Ehtesham indicated she was basing these findings on Bailey's severe panic attacks and mood swings, as well as racing thoughts. The ALJ stated he was giving this opinion "some weight," noting that, while Dr. Ehtesham had a treating relationship with Bailey which likely provided some insight and familiarity with her impairments, symptoms and limitations, *see* 20 C.F.R. § 404.1527(c)(2), the objective medical evidence illustrated Bailey had nondisabling mental symptoms. (R. at 21.) I find that substantial evidence supports the ALJ's weighing of Dr. Ehtesham's medical opinion. "[T]he ALJ is required to give controlling weight to opinions proffered by a claimant's treating physician so long as the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record." *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (alterations and internal quotations omitted); *see also* 20 C.F.R. § 404.1527(c)(2). Here, however, Dr. Ehtesham's opinion is not so supported or consistent. As stated above, mental status examinations performed by Dr. Watson repeatedly were normal, including normal behavior, judgment, memory and cognition. Additionally, Dr. Ehtesham's own treatment notes contradict her finding that Bailey had an unsatisfactory ability to maintain attention and concentration, as Bailey never endorsed any attention or concentration deficits, and Dr. Ehtesham noted none. Likewise, although Bailey had a tearful affect in September 2015 and some instances of intermittent eye contact, Dr. Ehtesham never noted that Bailey had any difficulty relating to her or behaving in an appropriate manner. Although Dr. Ehtesham noted Bailey's affect was anxious or agitated at times, she treated her on an outpatient basis with medication. She neither recommended nor referred Bailey for more intense treatment for her

psychiatric impairments, and Bailey has neither sought any emergent treatment for nor been hospitalized for exacerbations of her psychiatric impairments. Lastly, as stated above, such check-box assessments as the one used here by Dr. Ehtesham, are not entitled to great weight. *See Gerette*, 2016 WL 1296082, at *6.

For all of these reasons, I find that substantial evidence supports the ALJ's weighing of the medical opinion evidence related to Bailey's psychological impairments. Based on the same reasoning, I further find that substantial evidence supports the ALJ's mental residual functional capacity finding, limiting her to the performance of simple, routine work, requiring no more than simple work decisions, no more than occasional changes in a routine work setting and no more than occasional, superficial interaction with co-workers and the public. I now will turn to the weighing of the evidence related to Bailey's physical impairments.

In yet another check-box form, dated October 2017, Dr. Watson, Bailey's primary care provider, opined she could lift and carry items weighing up to 10 pounds occasionally and up to five pounds frequently; she could stand and/or walk for a total of three hours in an eight-hour workday, but could do so for 15 minutes without interruption; she could not sit at all in an eight-hour workday; she could never perform any postural functions; she had a limited ability to reach; and she had a limited ability to work around heights, moving machinery and vibration. Dr. Watson further opined Bailey would be absent from work more than two days monthly. The ALJ stated he was giving this opinion "some weight," noting Dr. Watson's treating relationship with Bailey and because the evidence supported limiting her exposure to workplace hazards. (R. at 21.) I first

note that the ALJ properly considered Dr. Watson's status as a treating source in deciding to give some weight to his opinion. *See* 20 C.F.R. § 404.1527(c)(2). However, I find that substantial evidence supports the ALJ's decision not to give this opinion controlling weight, as it is not supported by the medical evidence of record.

While the record shows, and the ALJ acknowledged, that Bailey suffers from multiple severe musculoskeletal impairments, these impairments have not resulted in disabling functional limitations. Specifically, as the ALJ stated in his decision, the majority of Bailey's physical problems relate to her back, knee, shoulder and hip pain and hand and finger numbness. (R. at 18.) He concluded she experienced major joint dysfunction in her hip, shoulder and knee, as well as DDD of the lumbar and cervical spine. (R. at 19.) Although diagnostic findings corroborate the existence of back and joint impairments, Bailey routinely presented with unremarkable or rather mild musculoskeletal symptoms. For instance, on several occasions, she demonstrated full strength and range of motion in her back, neck and extremities; a normal gait; intact sensation; full and symmetric deep tendon reflexes; no focal neurological deficits; and normal muscle tone and no extremity atrophy. On other occasions, she did demonstrate decreased range of motion, tenderness and spasm in the lumbar back; slight bilateral leg weakness of 4/5; left hip tenderness and slightly decreased range of motion; decreased range of motion and tenderness of the cervical back; bilateral paraspinous muscle spasms; decreased range of motion of the neck; left SI tenderness and gluteal tenderness with decreased rotation of the left lower extremity; positive straight leg raise testing; and left knee tenderness and effusion after an injury in 2017. However, Bailey underwent cervical spine surgery in February 2016, which resolved her radiating neck pain. Specifically,

the month following her surgery, Bailey advised her surgeon that her arm pain was completely resolved, and her neck pain was much improved. She also provided similar testimony at her hearing. Likewise, left SI joint injections improved Bailey's back and hip pain by about 50 percent, by her own report. She advised that these injections helped her significantly. In June 2017, Bailey advised Dr. Frye she could care for herself, perform household chores and walk for exercise. In July 2017, Dr. Frye performed a lumbar ESI, which Bailey reported resulted in a 50 percent sustained improvement in her back and leg pain. After this ESI, she described her pain as mild. With regard to Bailey's left knee, she tore the medial meniscus in 2017, for which she had surgery in October 2017. At follow-up visits, she was doing well with no restrictions in range of motion or pain. Although she alleged her symptoms were exacerbated by a December 2017 motor vehicle accident, a musculoskeletal examination at that time was normal, except for some mild tenderness in the posterior neck. In March 2018, Bailey could perform heel-to-toe walking, and she could stand without difficulty. It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Lastly, the court notes that Dr. Watson's opinion is contained on a check-box form and contains no explanation in support of his very restrictive findings. *See Leonard*, 2012 WL 4404508, at *4 (check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician).

In arriving at his physical residual functional capacity finding, the ALJ gave "great weight" to the opinions of the state agency physicians, Drs. Surrusco

and Cole, who opined Bailey could perform light work with postural and environmental limitations. (R. at 21.) The ALJ stated he was giving these opinions great weight because they largely were supported by the medical evidence, noting Bailey's unremarkable musculoskeletal symptoms. (R. at 21.)

For all of the above-stated reasons, I find that the ALJ's decision to give some weight to Dr. Watson's opinion, while giving great weight to the opinions of the state agency physicians, is supported by substantial evidence. Based on the reasons set out above, I also find that the ALJ's physical residual functional capacity assessment is supported by substantial evidence, as well.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's finding regarding Bailey's residual functional capacity; and

2.  Substantial evidence exists in the record to support the ALJ's finding that Bailey was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Bailey's motion for summary judgment, deny the Commissioner's motion for summary judgment and affirm the Commissioner's decision deny benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    July 22, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE